**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-0259-WJM-NYW

HAL LEWIS HEBERT,

     Plaintiff,

v.

RICK RAEMISCH, Executive Director, Colorado Department of Corrections,
JOHN CHAPDELAINE, Warden, Sterling Correctional Facility,
MICHELLE NYCZ, Major,
ROBERT KEISEL, Captain, and
CHASE FELZIEN, Lieutenant,

     Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Hal Lewis Hebert ("Hebert") is an inmate at the Sterling Correctional Facility ("Sterling"), a Colorado Department of Corrections ("CDOC") institution. He has sued various CDOC and Sterling officials (collectively, "Defendants") on the theory that double-celling at Sterling (*i.e.*, two inmates to a cell) combined with various other restrictions make life in his part of the prison intolerable to the point that inmates are driven literally to kill each other. (*See generally* ECF No. 1.) He therefore claims that Defendants are violating his Eighth Amendment right to be free from cruel and unusual punishment, and he seeks injunctive relief to end double-celling and other restrictions.

Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 97.) The undisputed evidence established through summary judgment briefing reveals a deeply disturbing situation at Sterling, which has seen at least eight inmate-

on-inmate murders in the past five years.  Senior CDOC officials with many years'

experience have never known an inmate homicide rate that high.  Hebert, however, fails

to offer evidence from which a trier of fact could conclude that the conditions of which

he complains, including double-celling, are causing the murders and other violence.

Accordingly, Defendant's Motion for Summary Judgment is granted.

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence

and all reasonable inferences therefrom in the light most favorable to the nonmoving

party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In

addition, the Court must resolve factual ambiguities against the moving party, thus

favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th

Cir. 1987).[1]

---

[1] This case will be tried to the Court, rather than to a jury.  (*See* ECF No. 125; ECF No.
127 at 23.)  In such a circumstance, some circuits allow their district courts to make factual

## II.  FACTS

The following facts are undisputed unless otherwise noted.

### A.    Double-Celling at Sterling

Sterling is essentially two prisons in one.  The east side is a relatively low security facility, while the west side is the "so-called high security side."  (ECF No. 106 at 6, ¶ 3.)[2]

Living Units 1–4 on the west side "are prefabricated, concrete buildings," each with a capacity to house 300 inmates.  (*Id.* at 6, ¶ 4.)  Each Unit is divided into three "pods," and each of these pods has three tiers of cells opening onto a common day room.  (*Id.*)  The day room "has a variety of fixed seating, microwave ovens, and telephones."  (*Id.*)

Of particular importance to this litigation, Living Units 1–4 are entirely double-celled, meaning each cell has two beds (bunk beds, specifically) and houses two

---

findings at the summary judgment phase if the court can confidently say that presentation of live evidence would make no difference.  *See, e.g.*, *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003); *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400–01 (1st Cir. 1988).  Other circuits hold that the summary judgment standard remains the same regardless.  *See, e.g.*, *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1315 (8th Cir. 1987); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967).  As far as this Court could locate, the Tenth Circuit has never addressed this question directly, but it appears to lean in favor of the latter view.  *See, e.g.*, *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) ("Although a district court can make factual findings related to laches after a bench trial, the court should not make factual findings when addressing a summary judgment motion based on laches . . . ." (citation omitted)).  This Court will therefore apply the same summary judgment standard it would apply if the case was set for a jury trial.

[2] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

inmates.  (ECF No. 97 at 4, ¶ 10; ECF No. 106 at 6–7, ¶¶ 4–5.)[3]  Each of these double-occupancy cells is approximately 12'6" deep, 6'9" wide, and 8'4" tall.  (*Id.* at 7, ¶ 7; ECF No. 97-6 at 5.)  The bottom bunk is about 1'9" off the ground, and the top bunk is about 5'6" off the ground.  (ECF No. 106 at 7, ¶ 7.)  The bunks are attached to one wall and are each about 6'9" long and 2'8" wide.  (*Id.*)  Each cell also has two storage boxes, two desks, two stools, an open toilet, a sink, and shelving.  (*Id.* ¶ 8.)  Thus, although the total floor area of the cell is roughly 90 square feet, the ability to move about within that area is substantially limited.

Cell assignments in Living Units 1–4 can be made by "lieutenants, sergeants, captains, or [Sterling's] Internal Classification Committee."  (ECF No. 97 at 5, ¶ 12.)  When making such assignments, the assigning officer considers sexually aggressive behavior, sexual vulnerability risk, security threat group affiliations, race, age, length of sentence, and medical accommodations under the Americans with Disabilities Act.  (*Id.* ¶ 13.)

Inmates can request a change in cell assignment, and the request will be granted "[i]f there is a valid concern which [prison staff] can corroborate."  (*Id.* ¶ 14.)  However, prison staff generally takes a wait-and-see approach because cell assignments are rarely perfect.  (ECF No. 106 at 11, ¶ 24.)  Hebert further contends that any inmate who actually complains about a cell assignment is "mark[ed]" by other inmates as "someone who takes problems to the administrators," which "makes trouble

---

[3] The parties dispute whether Living Units 1–4 were designed with double-celling in mind.  (*Compare* ECF No. 97 at 4, ¶ 9 *with* ECF No. 106 at 3, ¶ 9.)  The Court does not find this dispute material to the present issues.

for [that inmate]."  (ECF No. 106-3 at 22.)  Moreover, says Hebert, an inmate who

simply refuses to be cellmates with another will be sent to solitary confinement.  (*Id.*)

**B.      Hebert's Experience**

A Colorado jury convicted Hebert of first-degree murder in 2003, and Hebert was

subsequently sentenced to life in prison without the possibility of parole.  *See Hebert v.*

*Milyard*, 2011 WL 5834675, at *3 (D. Colo. Nov. 18, 2011).  He is currently 73 years

old.  (ECF No. 106 at 6, ¶ 1.)  Since 2008, he has been housed in Living Units 1–4.  (*Id.*

¶¶ 1, 3.)  He has had at least thirty-two cellmates.  (*Id.* at 3, ¶ 15.)  One of his cellmates

had a record of twelve assaults, including two assaults on other inmates.  (*Id.* at 6, ¶ 2.)

Nine of his cellmates "were listed as having at least one assault on their [respective]

record[s]."  (*Id.*)

Hebert says he has been assaulted by a cellmate on at least three occasions.

(*Id.* at 10, ¶ 21.)  The parties' briefs do not specify when any of these alleged assaults

took place, nor does Hebert assert that his assailants were among those just mentioned

with assaults on their records.  Hebert nonetheless claims that "[0]ne cellmate struck

him with a combination lock that was in his sock and put a gash in [Hebert's] forehead

that [required] several stitches"; another cellmate attacked him in some unspecified

manner and caused bruises and small cuts to Hebert's face; and another cellmate

attacked him in an unspecified manner when that cellmate became annoyed with some

of Hebert's behaviors.  (*Id.*)

Hebert did not notify any Defendant of these assaults, nor did he notify any

prison staff member with authority over cell assignments or inmate discipline.  (ECF

No. 97 at 6, ¶ 18.)  He argues that prison medical staff were at least on notice of something violent having happened because he had "injuries he could not conceal for which he received anatomical exams." (ECF No. 106 at 4, ¶ 18.)  But he admits he never "reported assaults by cellmates because," he says, doing so "results in inmates assuming that one is a 'weakling and potential victim.'  Reporting to staff invites further 'misery' from other inmates."  (*Id.* at 10, ¶ 21.)

## C.   Recorded Inmate Violence Before June 2012

At least two inmates in Living Units 1–4 died at the hands of their cellmates before June 2012 (a date when Sterling's warden implemented certain changes, discussed in Part II.D, below):

- Inmate David Guerrero-Estrada was found dead in his cell at 6:40 a.m. on January 14, 2010, having suffered "blunt trauma" inflicted by his cellmate. (*Id.* at 12, ¶ 28; ECF No. 106-12 at 3.)

- Inmate Mark Hanson was found dead in his cell at approximately 4:15 a.m. on November 25, 2011, having likewise been beaten to death by his cellmate.  (ECF No. 106 at 13, ¶ 29; ECF No. 106-13 at 3.)

During this same time frame, four other inmates died in their cells under circumstances suggesting that they had been murdered by their cellmates, although the record contains no evidence positively identifying those cellmates as the perpetrators:

- An inmate "was found unresponsive on the floor of his cell on [January 30, 2010]" and was "pronounced dead a short time later."  (ECF No. 106 at 13, ¶ 33; ECF No. 106-12 at 2.)  The record does not contain this inmate's name, the time of day he was discovered, the cause of death, or any

6

information about his cellmate.

- Inmate Peyman Bahadori was found "not breathing" at 9:39 a.m. on September 12, 2010.  He was taken to the hospital and pronounced dead.  His "cell was secured as a crime scene" and his cellmate was removed from the general population.  (ECF No. 106 at 13, ¶ 33; ECF No. 106-11 at 2.)

- Inmate Frank Wolf was found "unresponsive" in his cell at approximately 6:00 p.m. on September 17, 2010, and was pronounced dead not long after.  His cell "was locked down as a potential crime scene" and his cellmate was removed from the general population.  (ECF No. 106 at 13, ¶ 33; ECF No. 106-11 at 3.)

- Inmate Lyle White was found unresponsive in his cell, "the victim of an apparent assault," at 8:15 a.m. on November 29, 2011, and he died at the hospital a few days later.  (ECF No. 106 at 13, ¶ 30; ECF No. 106-13 at 4.)

Finally, although not clearly a cellmate-on-cellmate homicide, inmate Cleveland Flood was discovered at 11:15 p.m. on February 12, 2011 "on the floor face up in a large pool of blood between two [other inmates]," and investigators found two homemade knives at the crime scene.  (ECF No. 106 at 13, ¶ 31; ECF No. 106-14 at 2.)  Thus, before June 2012, there have been two confirmed cellmate-on-cellmate homicides (Guerrero-Estrada and Hanson), three or four suspected cellmate-on-cellmate homicides (Bahadori, Wolf, and White, and possibly the unnamed individual who died on January 30, 2010), and one inmate-on-inmate homicide that does *not*

appear to be a cellmate-on-cellmate matter (Flood).

In addition to homicides, Sterling recorded approximately 55 inmate-on-inmate assaults in Living Units 1–4 between January 2010 and May 2012, or about 1.9 per month.  (ECF No. 106 at 14, ¶ 34; ECF No. 106-18 at 4–6.)  Nothing in the record specifies whether any of these inmate-on-inmate assaults were also cellmate-on-cellmate assaults.

## D.    Effect of June 2012 Schedule Changes

All inmates must follow a "controlled movement schedule," which is the "schedule by which inmates are moved throughout the day for work assignments, recreation, dining hall, and other activities."  (ECF No. 106 at 7, ¶ 9.)  Defendants claim that, outside of certain circumstances such as lockdowns, the controlled movement schedule allows inmates "to freely move from their cells into the day hall or to their jobs or classes."  (ECF No. 97 at 7, ¶ 26.)

Before June 2012, the controlled movement schedule in Living Units 1–4 permitted inmates to be out of their cells 11–12 hours per day.  (ECF No. 106 at 9, ¶ 16.)  In June 2012, Sterling changed this schedule.  (ECF No. 97 at 8, ¶ 27.)[4] Defendants characterize the changes as "allow[ing] for offenders to spend less free time in the day hall."  (*Id.*)  This choice of words suggests that inmates can choose to spend less time in the day hall.  In reality, the new schedule requires inmates to spend more time in their cells, generally only allowing them out for two hours in the morning, two hours in the afternoon, two hours in the evening, and for dining hall trips.  (ECF

---

[4] Hebert claims the precise date of the change was June 4, 2012.  (ECF No. 1-1 at 16.)

No. 106 at 8, ¶ 10.)  Hebert claims that "[w]ork at job assignments is part of the two-hours out-of-cell periods."  (*Id.* at 9, ¶ 17.)  Thus, according to Hebert, an inmate with a work assignment cannot use his out-of-cell time for recreation.  (*Id.*)

Hebert claims that inmates rarely get the entire out-of-cell time allotted because prison guards are "often not ready for movements on time," and inmates must be back in their cells before the end of their allotted time, so prison guards "will begin moving inmates back into their cell[s] minimally 10 minutes early."  (*Id.* at 8, ¶ 13.)  Moreover, Hebert says that lockdowns further cut into inmates' time out of their cells.  (*Id.* ¶ 14.) He claims that, over an allegedly representative three-week period, he was locked down "four or five days" on account of things like staff meetings, a staff potluck party, an inmate's assault on a guard, and a search for contraband.  (*Id.*)

## E.     Other Difficulties

Although not directly linked to the June 2012 controlled movement schedule, Hebert also complains about other aspects of life in Living Units 1–4.  Hebert asserts, for example, that Sterling provides only one set of cleaning supplies per pod, and getting a chance to use these supplies is a "real hassle."  (*Id.* at 9, ¶ 18.)  Hebert alleges, moreover, that the "[c]leaning solutions are diluted to the extent that they are of no value for cleaning," and "[m]ost inmates do not clean their cells and they turn into messes."  (*Id.*)

Hebert also characterizes the "[n]oise levels in the pod dayrooms" as "comparable to just under a rock band level," making in-person and telephone conversations very difficult.  (*Id.* at 12, ¶ 26.)

**F.      Recorded Inmate Violence From June 2012 to Date**

From June 2012 to date, two additional murders have occurred in Living Units

1–4:

- On June 14, 2012—just after the June 2012 changes to the controlled

   movement schedule[5]—inmate James Roemer was murdered by his

   cellmate.  (*Id.* at 14, ¶ 38; ECF No. 106-17 at 1.)  The summary judgment

   record contains no other details.[6]

- On August 11, 2014, an inmate with the last name of Gray (his first name

   is not in the record) was murdered in a cell other than his own.  (ECF No.

   106 at 13, ¶ 32; ECF No. 106-15 at 2.)

As for other violence, Sterling has recorded 56 inmate-on-inmate assaults in Living

Units 1–4 from June 2012 through June 2014 (the last month for which statistics have

been submitted), or about 2.2 per month.  (ECF No. 106-18 at 6–9.)  As with the pre-

June 2012 statistics, the record does not specify whether any of these inmate-on-

inmate assaults were also cellmate-on-cellmate assaults.

**G.      Hebert's Informal Complaints and Formal Grievances**

Following inmate Roemer's death in June 2012, Hebert wrote a letter to

Governor Hickenlooper.  (ECF No. 97 at 7, ¶ 22.)  Hebert described Roemer's

personality and ambitions, characterized Sterling as a "death factory," and asserted

_____

[5] The exact date of the June 2012 schedule change appears to be somewhat in dispute. The Court describes the June 14, 2012 murder as "just after the June 2012 changes" because that is the view of the evidence most favorable to Hebert, the non-movant.

[6] Further details, as alleged by Roemer's estate in the ensuing lawsuit, can be found at *Roemer v. Carochi*, 2015 WL 5728769 (D. Colo. Sept. 29, 2015).

essentially the same argument he makes here, *i.e.*, that prison officials have violated the Eighth Amendment through their knowledge of the likelihood of murder and their failure to do anything about it.  (ECF No. 97-9 at 1.)  The letter does not mention double-celling.

This letter eventually made its way to Defendant Nycz.  (ECF No. 97 at 7, ¶ 22.) Hebert then met with Nycz at Nycz's request.  (*Id.*)  Nycz has the title of major at Sterling (ECF No. 106 at 12, ¶ 25), but her precise role is unexplained.  Nonetheless, she and Hebert discussed Hebert's concerns.  Hebert did not inform Nycz of any specific threats he might have received.  (ECF No. 97 at 7, ¶ 22; ECF No. 97-7 at 19.) He complained, instead, about his inability to have his own cell and also that the new controlled movement schedule "made inmates' existence at [Sterling] even less tolerable than before," with "provocative effects."  (ECF No. 97-9 at 2; *see also* ECF No. 97-2 at 2.)  Hebert says that Nycz generally disagreed with him.  (ECF No. 97-9 at 2.)

In July 2012, not long after his meeting with Nycz, Hebert sent a letter to James Falk, who was Sterling's warden at the time.  (ECF No. 97 at 7, ¶ 23; ECF No. 106 at 14, ¶ 35.)[7]  Hebert did not assert any specific threat to his life or safety, but complained that double-celling was the "plainly apparent root cause" of the various murders at Sterling and that "[t]he only way to alleviate (but not to eliminate) the danger plainly inherent in double-confinement within such inhumanly small spaces is to allow (indeed, encourage) inmates to have and utilize maximum out-of-cell time."  (ECF

---

[7] Falk was originally a defendant here, sued in his official capacity as warden.  As of March 2015, however, he was no longer Sterling's warden.  (ECF No. 106 at 14, ¶ 35.) Pursuant to Federal Rule of Civil Procedure 25(d), this Court therefore ordered the new warden, John Chapdelaine, to be substituted for Falk.  (*See* ECF Nos. 121, 123, 126.)

No. 97-10 at 1; *see also* ECF No. 97 at 7, ¶ 23.)  Thus, according to Hebert, the new

controlled movement schedule (which Hebert attributed to Falk personally) only created

additional tension:

> Perversely, and contrary to intuitive good sense, the
> schedule <u>cut in half</u> the time an inmate has available in
> which he can choose to avoid forced association with his
> cell-mate.  Predictably, the level of anger and resentment
> immediately rose and combined with the ongoing tension
> and stress due to double-celling.  Just nine days later,
> [Roemer was murdered by his cellmate].

(ECF No. 97-10 at 1 (underscoring in original).)  Hebert invited Falk to spend a week as

his cellmate so Falk could confirm Hebert's complaints firsthand.  (*Id.* at 2.)

The record contains nothing indicating whether Falk responded to this letter.

The following month, however, Hebert initiated CDOC's formal grievance process.

(ECF No. 97 at 3, ¶ 5.)  Hebert recounted his refused request to a corrections officer for

"a non-punitive single cell" in order "to protect [his] right to stay alive long enough to

establish [his] actual innocence."  (ECF No. 97-4 at 1.)  Hebert described double-celling

as "the root cause of murder-by-cellmate" and again demanded his own cell.  (*Id.*)

Defendant Felzien, a prison official, denied Hebert's grievance "on procedural grounds"

because Hebert "has know [*sic*] or should have known about the stated condition since

2008 when he arrived at thwe [*sic*] facility."  (*Id.* at 2.)

Hebert then administratively appealed the denial of his grievance, arguing that

he could still obtain an injunction against ongoing violations, even if he had known

about them for many years earlier.  (ECF No. 97-5 at 1.)  He again asked that prison

officials "grant [his] request [for a single cell]; or provide a rational reason for refusal."

(*Id.*) Defendant Keisel, a prison official, again denied the grievance, explaining that, per Sterling operating procedures, "single cells may only be temporarily assigned. There are no designated permanent single cells in general population." (*Id.* at 2.)

Hebert filed this lawsuit in January 2013. (ECF No. 1.)[8]

## H.    Raemisch's & Falk's Views

Hebert originally named CDOC Executive Director Tom Clements as the lead defendant. (*Id.*) As is well known, Clements was murdered in March 2013. Defendant Raemisch took over as Executive Director in July 2013 (ECF No. 106 at 15, ¶ 42), and was subsequently substituted for Clements under Federal Rule of Civil Procedure 25(d) (ECF Nos. 108, 118).

At the time Raemisch took over, all but one of the homicides recounted above (the Gray homicide in August 2014) had already taken place. When Raemisch learned of the number of homicides at Sterling, he considered it to be unusually high based on his prior experience as Deputy Secretary and Secretary of the Wisconsin Department of Corrections. (ECF No. 106 at 15, ¶¶ 42–43.) Although the Wisconsin corrections system housed about 22,000 inmates, compared to CDOC's 20,000 inmates, Raemisch could recall only a single inmate-on-inmate homicide in Wisconsin, which took place in 1994. (*Id.* ¶ 43.)

---

[8] The parties agree that CDOC has a three-step grievance process, not just a two-step process. (ECF No. 97 at 3, ¶ 4.) Nothing in the summary judgment briefing addresses Hebert's satisfaction of the third step, but Defendants do not argue that Hebert failed to exhaust his administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 211–12 (2007) (PLRA exhaustion is an affirmative defense that defendants must raise, not a prerequisite that plaintiffs must plead). In any event, Hebert attached documents to his complaint showing that he pursued, and apparently completed, the third step of the grievance process in September through November 2012. (ECF No. 1-1 at 9–13.)

Falk's view was similar.  Falk has worked at four CDOC facilities over twenty-three years.  (*Id.* at 14, ¶ 35.)  At his deposition, Falk agreed with Hebert's counsel that "no other facility in the Department of Corrections has experienced this level of homicides in this period of time."  (ECF No. 106-1 at 10.)  Falk believes, however, that the number of murders at Sterling is coincidental.  (*Id.*)

I.     **The ASCA Audit**

Around the time Raemisch became CDOC's Executive Director, he heard from a subordinate that Clements may have ordered an investigation into the Sterling homicides.  (*Id.* ¶ 44.)  Raemisch also learned of a July 2014 Westword newspaper article reporting the number of recent homicides at Sterling and mentioning "[a]n internal investigation, with findings never made public, . . . ordered by prison chief Tom Clements."  (*Id.* ¶¶ 44–45; ECF No. 106-8 at 1.)  Raemisch then asked his staff whether the investigation had been completed.  (ECF No. 106 at 15–16, ¶¶ 44–45.)  When asked at his deposition whether his staff located the investigation report, Raemisch replied, "my memory is somewhat vague, but I recall that there was just something—the report either wasn't done or there wasn't a report or it didn't—wasn't handled the way it should have been.  I just don't recall."  (*Id.* at 16, ¶ 46.)

Following inmate Gray's homicide in August 2014, however, Raemisch himself commissioned an audit of Sterling by the Association of State Correctional Administrators ("ASCA").  (*Id.* at 17, ¶ 51.)[9]  The effect of double-celling was not part of

---

[9] Defendants characterize ASCA as a "neutral third party."  (ECF No. 97 at 7, ¶ 24.) Hebert disagrees, pointing out that Raemisch is an ASCA member and that one of the five members of the audit committee was the man who had served as CDOC's interim executive director between the death of Clements and the appointment of Raemisch.  (ECF No. 106

the audit because, according to Raemisch, double-celling is "so common." (*Id.* at 18, ¶ 52.)  Raemisch could not recall whether anyone asked the audit committee to consider the effect of the June 2012 changes to the controlled movement schedule. (*Id.*)

As summarized by Hebert, the audit committee's eventual report largely focused on staffing shortages, employee dissatisfaction, and lack of training.  (*See* ECF No. 106 at 18–20, ¶¶ 53–58.)[10]  The committee did not link any of these problems to the recent inmate-on-inmate homicides.  (*Id.* at 18, ¶ 53.)  The committee nonetheless noted the feedback it received from inmate focus groups.  According to those groups, "inmates who would likely be threatening, assaulting and potentially killing one another on the west [high security] side can move to the east [lower security] side and reasonably peacefully coexist" because inmates on the east side can generally look forward to being released from prison and do not want to jeopardize that possibility through bad behavior.  (*Id.* at 21, ¶ 59.)  Many inmates on the west side, by contrast, are "likely to die in prison."  (*Id.*)  "[T]o encourage pro-social behavior among [these] difficult to manage inmates," the committee recommended a "first step" of "de-coupling custody

---

at 17, ¶ 51.)  The parties do not frame this as a dispute of material fact, however, and the Court does not otherwise perceive its materiality.

[10] Defendants' response to Hebert's summary is to "[a]dmit to the findings of the Committee."  (ECF No. 107 at 8–9, ¶¶ 54–59.)  Defendants do not, therefore, actually deny anything in Hebert's summary.  To the extent that "admit to the findings of the Committee" is meant as an implied denial of some sort, it does not satisfy the undersigned's requirement that "[a]ny denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial."  WJM Revised Practice Standard III.8.b.  Defendants also do not offer any sort of hearsay objection to Hebert's summary or the committee report itself.  *Cf.* Fed. R. Civ. P. 56(c)(2).

classification from discipline and internal management." (*Id.*)[11]  The committee also observed that both prison staff and inmates felt that conditions would improve if inmates had "ability to access [treatment and education] programs in a logical and timely manner"—as opposed to the present state, where neither staff nor inmates could discern any reasoned judgment behind choices to approve or disapprove of inmates' programming needs and requests.  (*Id.* at 20, ¶ 58.)

In response to the committee's findings, Raemisch assigned a subordinate "to create an action plan," "which appears to be ongoing, [and] has instituted a number of culture changes" among Sterling employees.  (*Id.* at 21, ¶¶ 60, 62.)  The action plan "has no discussion of changes to programming and no mention of changes to classification practices.  There were no changes to cell assignment practices, double-celling practices[,] and none to the [controlled movement schedule]."  (*Id.* at 22, ¶ 63.)

## III.  ANALYSIS

### A.    Defendants Keisel and Felzien

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (internal quotation marks omitted).  Furthermore, "a denial of [an inmate's] grievance, by itself without any connection to the violation of constitutional rights alleged by [the inmate], does not establish personal participation under § 1983."  *Id.*  Citing this authority, Keisel and Felzien argue that Hebert's claim against them fails because he has not alleged any personal participation beyond denying his grievances.

---

[11] No party explains what this recommendation really means, and Hebert does not ask for relief based on it.  Accordingly, the Court will not discuss it further.

(ECF No. 97 at 9–10.)  In response, Hebert states that he "does not contest

Defendants' motion as it relates to Defendants Keisel and Felzien."  (ECF No. 106 at 22

n.1.)  Accordingly, the Court grants summary judgment in favor of Keisel and Felzien.

**B.     Eighth Amendment Standard for Claims of Cruel and Unusual Prison
        Conditions**

The Eighth Amendment's prohibition of "cruel and unusual punishments" grants

prisoners "a right to be reasonably protected from constant threats of violence . . . from

other inmates."  *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996) (internal

quotation marks omitted).  This is so because "[b]eing violently assaulted in prison is

simply not part of the penalty that criminal offenders pay for their offenses against

society."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks

omitted).

However, not "every injury suffered by one prisoner at the hands of another . . .

translates into constitutional liability for prison officials responsible for the victim's

safety."  *Id.*  Rather, "a prison official violates the Eighth Amendment only when two

requirements are met."  *Id.*  First, "[f]or a claim (like the one here) based on a failure to

prevent harm, the inmate must show that he is incarcerated under conditions posing a

substantial risk of serious harm."  *Id.*  Second, the relevant prison officials "must have a

sufficiently culpable state of mind.  In prison-conditions cases that state of mind is one

of deliberate indifference to inmate health or safety."  *Id.*  A prison official shows

deliberate indifference when he or she "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference." *Id.* at 837.

## C.    Hebert's Theory of Liability

Hebert claims that he faces a substantial risk of serious harm because

conditions and restrictions in Living Units 1–4 are so generally frustrating and

uncomfortable that inmate-on-inmate homicide, and cellmate-on-cellmate homicide in

particular, is certain to continue.  Hebert therefore requests injunctive relief of the

following character:

> 1. Defendants to cease and desist the practice of
> double-celling inmates in the high security side, including
> Living Units 1–4, allowing for only one inmate per cell;
>
> 2. Revision of the current controlled movement schedule to
> allow for, at a minimum, sixteen hours outside the locked
> confines of an inmate's cell, with increased access to gym
> and the outdoor yard;
>
> 3. Development and revision of treatment and educational
> programs to encourage pro-social behavior in [Sterling], in
> particular, for those inmates in the high secur[ity] side of
> [Sterling] . . . .

(ECF No. 127 at 4.)[12]

---

[12] Notably, although Hebert seeks prison-wide relief, this case is not a class action.  In
the Amended Final Pretrial Order, Defendants briefly argue that the scope of requested relief
somehow violates principles of third-party standing.  (*See* ECF No. 127 at 9–10.)  The Court
finds this argument unpersuasive.  Hebert alleges prison conditions that supposedly put all
inmates, including him, at risk of being killed by other inmates.  As the Supreme Court
previously stated, "it does not matter . . . whether a prisoner faces an excessive risk of attack
for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*,
511 U.S. at 843.  Moreover, just as "[i]t would be odd to deny an injunction to inmates [plural]
who plainly proved an unsafe, life-threatening condition in their prison on the ground that
nothing yet had happened to them," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), it would
likewise be odd to deny such an injunction to a single inmate.  Finally, it may be impossible to
provide Hebert the safety he claims he deserves without an injunction that addresses living
conditions for all prisoners.  Accordingly, the lack of class certification does not prevent the
Court from considering the relief Hebert requests.

It is beyond dispute that being murdered by a fellow cellmate satisfies the "serious harm" component of the "substantial risk of serious harm" requirement. Defendants, however, argue that Hebert cannot demonstrate a "substantial risk" of that harm, and that he cannot demonstrate their deliberate indifference.  The Court will address both arguments in turn.

**D.     Substantial Risk of Serious Harm**

Hebert's claim rests on the effect of double-celling combined with various other conditions in Living Units 1–4.  The Court's discussion must therefore begin with *Rhodes v. Chapman*, 452 U.S. 337 (1981), apparently the only Supreme Court case to address directly the potential for double-celling to violate the Eighth Amendment.

1.     Double-Celling in Light of *Rhodes*

In *Rhodes*, the district court had found that double-celling at the maximum-security Southern Ohio Correctional Facility ("SOCF") constituted cruel and unusual punishment.  *Id.* at 343.  In reaching this finding, the district court was particularly persuaded by

> the long terms of imprisonment served by inmates at SOCF; the fact that SOCF housed 38% more inmates than its "design capacity"; the recommendation of several studies that each inmate have at least 50–55 square feet of living quarters; the suggestion that double-celled inmates spend most of their time in their cells with their cellmates; and the fact that double celling at SOCF was not a temporary condition.

*Id.* at 348.  The Supreme Court, however, held that

> [t]hese general considerations fall far short in themselves [of] proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances

19

> either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. At most, these considerations amount to a theory that double celling inflicts pain. Perhaps they reflect an aspiration toward an ideal environment for long-term confinement. But the Constitution does not mandate comfortable prisons, and prisons of SOCF's type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court.

*Id.* at 348–49 (footnotes omitted).

*Rhodes*'s holding necessarily implies that double-celling is not *per se* unconstitutional. *Rhodes*'s reasoning, moreover, establishes that inmates do not suffer cruel and unusual punishment solely because they must endure the close-quarters discomforts that double-celling necessarily entails. But *Rhodes* did not shut the door on all Eighth Amendment claims based on double-celling. The Supreme Court specifically noted the district court's finding "that the number of acts of violence at SOCF had increased with the prison population, but only in proportion to the increase in population." *Id.* at 342–43. Given this, the Court concluded that double-celling did not "increase violence among inmates." *Id.* at 348. The Court also noted the inmates' argument "that the close confinement of double celling for long periods creates a dangerous potential for frustration, tension, and violence," particularly rioting. *Id.* at 350 n.14. The Court rejected this contention because it had no support in the district court's findings regarding SOCF, *see id.*, but all of the foregoing suggests that *Rhodes* left open the possibility that a demonstrated increase in violence caused by double-celling might make double-celling unconstitutional in a particular case. That is essentially

Hebert's theory here, *i.e.*, that double-celling combined with the many other indignities of life in Living Units 1–4 creates a toxic atmosphere that has led to, and inevitably will lead to, inmate murders.

2.   Relevant Case Law Since *Rhodes*

Hebert has cited only two cases extending *Rhodes* in this general direction. Hebert primarily relies on *Tillery v. Owens*, 907 F.2d 418 (3d Cir. 1990), which addressed conditions at Pennsylvania's State Correctional Institution at Pittsburgh ("SCIP").  *Id.* at 420.  SCIP "date[d] to the late 1800s" and was not designed for double-celling, but "since 1982 inmates increasingly ha[d] been placed two to a cell because the prison lacked space for its increasing population."  *Id.* at 421.  Although double-celling necessarily reduced the usable space in the inmates' cells, the district court concluded that

> 20% to 25% of the inmates fear to leave [their cells] for recreation and exercise because they fear physical assault. Much of the insecurity is due to understaffing.  For example, the 741 inmates housed in South Block are supervised by only seven officers at most and guards cannot see many areas of the block.  Between 1984 and 1988, there were an average of 97 reported inmate assaults each year at SCIP. The district court found that there were many more unreported assaults, and that there was arson, drug use and theft.  Weapons such as knives, ice picks, razors and homemade guns are easily available to inmates.  Most are manufactured by inmates in the prison industry facilities and smuggled out.  Inmates leaving the facility are not searched on a regular basis and no metal detector is in place.
>
> According to the district court, "the auditorium and gymnasium are virtual dens for violence.  Assaults, stabbings, rapes, and gang fights occur in the auditorium. During peak times, several hundred inmates may be present in these facilities with only one corrections officer. . . .  The

> corrections officers do not make rounds; they wisely choose
> to stand by the door next to the riot button."

*Id.* at 422–23.

Beyond overcrowding and understaffing, SCIP was "unsanitary and dangerous" given: a lack of cleaning supplies and no general cleaning plan; "grossly inadequate" ventilation, including "no systems to control temperature or humidity"; "endemic" bedbugs, mice, mites, fleas, and lice, as well as a bird population in the rafters, with all of its attendant droppings; "inadequate" plumbing, leading to standing septic water and accumulation of human waste "for as long as 2 days" during plumbing repairs; "an inadequate number" of showers in light of the population, as well as inadequate security in the showers, leading some inmates to forgo them and sponge themselves off in their own cells; a "poor level of fire protection" and no effective evacuation plan in case of a fire; and "shockingly deficient" medical and psychiatric treatment. *Id.* at 423–24.

"It [was] within this squalid, dangerous and overcrowded environment that double-celling takes place . . . coupled with chronic understaffing." *Id.* at 424. Furthermore, the problems linked to double-celling were "exacerbated by SCIP's inefficient inmate classification system." *Id.* The record was "replete with instances where an inmate ha[d] been double-celled even though his propensity for violence, emotional instability, primitive personal hygiene habits or past encounters with a designated cell partner clearly dictated that he should [have been] single-celled." *Id.* (internal quotation marks omitted).

The district court in *Tillery* "concluded that SCIP was unconstitutionally overcrowded and that sanitation, lighting, shower conditions, ventilation, inmate

security, fire safety and health care fell below constitutional requirements." *Id.* at 425. The district court ordered, among other things, an end to double-celling, which was the only portion of its order that the defendants appealed. *Id.* at 420.

"In this case," said the Third Circuit, "the constitutionality of double-celling must be analyzed in the context of the district court's determination, well supported by the record, that almost every element of the physical plant and provision of services at SCIP falls below constitutional norms." *Id.* at 427. The court distinguished decisions "finding double-celling to be permissible[, which] have emphasized that the general prison conditions were otherwise adequate," from decisions finding "double-celling . . . to be unconstitutional" because "it ha[d] been imposed in a decaying physical plant with inadequate staff and security." *Id.* The district court's decision obviously fell in the latter category, and the Third Circuit found it well supported: "while double-celling may not always cause unconstitutional levels of violence, filth or fire hazard, double-celling in an institution plagued with such problems may be so unbearable as to 'deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* at 428 (quoting *Rhodes*, 452 U.S. at 347).

Aside from *Tillery*, Hebert's only other supporting case is *Nami v. Fauver*, 82 F.3d 63 (3d Cir. 1996). *Nami*, decided on appeal from the grant of a Rule 12(b)(6) motion, involved an unconstitutional conditions claim based on the combination of the following alleged conditions in the high-security area of a New Jersey youth correctional facility: double-celling (including with inmates suffering from psychiatric problems, or who are violent felons, or who smoke), which had "resulted in rapes and other assaults,

as well as psychological stress"; inmates' confinement to their cells except for "half-hour

to one-hour job assignments," visits, and "one two-and-a-half hour [recreation] period

two days per week"; faulty ventilation; unsanitary conditions in the outdoor exercise yard

because inmates are "denied bathroom access" during that time; "more restricted"

access to required drug and alcohol programs, as compared to the general population;

a requirement to wear a painful restraining device when going on excursions outside

the prison "which is so uncomfortable that inmates are deterred from seeking medical

or dental help"; and prison staff's unresponsiveness to medical and dental requests. *Id.*

at 65–66. The Third Circuit found that these allegations were enough to state a claim

for relief and therefore reversed the district court, which had improperly analyzed these

allegations discretely rather than as a whole. *Id.* at 66–68.

Although not cited by Hebert, the Court also finds instructive a District of Utah

decision, *Baker v. Holden*, 787 F. Supp. 1008 (D. Utah 1992). *Baker* addressed

conditions in the "Wasatch Unit" of the Utah State Prison. *Id.* at 1008–09. "The

Wasatch Unit was constructed in the 1950s and [was] the oldest of three . . . facilities at

[the Utah State Prison complex]. [Its] cells were designed for single inmate occupancy."

*Id.* at 1009. The district court had entered preliminary injunctions in 1986 and 1988

against double-celling in certain blocks of the Wasatch Unit. *Id.* at 1008–09. The

question resolved by the court in its 1992 *Baker* decision was whether to maintain those

injunctions in light of substantial changes in the Wasatch Unit over the years that the

case had been pending. *Id.*

The court does not describe what prompted it to enter the preliminary injunctions

in the first place.  As to maintaining them, however, the court conducted a granular, cellblock-by-cellblock analysis of numerous considerations, including fire safety, size of cell, out-of-cell time, ventilation, number of showers, state of the common areas, and state of support facilities such as the kitchen and the laundry.  *Id.* at 1010–19.  Although the court did not mention any actual incidents of violence, it also considered inmates' personal safety.  Concerning one particular cellblock, for example, the court noted that "personal safety will be maximized" with "adequate staffing, including additional security guards as rovers, and the application of methods in effect in other areas of the prison to match medium level offenders of non-violent proclivity as cell mates."  *Id.* at 1019. Ultimately, the court chose to lift the injunction as to certain cellblocks and maintain it as to others.  *Id.* at 1019–20.

      3.    <u>Application to Living Units 1–4</u>

Prison conditions do not violate the Eighth Amendment if they do not deprive inmates of basic human needs, which include at least food, clothing, shelter, warmth, medical care, sanitary conditions, exercise, and personal safety.  *See Farmer*, 511 U.S. at 832; *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *Rhodes*, 452 U.S. at 348.  A claim attacking a prison's "'overall conditions' can[not] rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."  *Wilson*, 501 U.S. at 305.  But, "[s]ome conditions of confinement" may indeed "establish an Eighth Amendment violation 'in combination' when each would not do so alone," if "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need."  *Id.* at 304 (emphasis removed).

According to Hebert, his personal safety (a recognized human need) is threatened by a combination of conditions in Living Units 1–4.  Defendants' summary judgment motion challenges this assertion.  The Court believes the best way to resolve this dispute is to begin with a hypothetical: *Excluding* the evidence of murders in Living Units 1–4, would Hebert have enough evidence to go to trial on a claim of unconstitutional conditions?  In other words, if Hebert had brought this lawsuit solely out of exasperation over the many alleged frustrations of daily living in Living Units 1–4, would he have a claim?

The answer is no.  *Rhodes* itself established that the inevitable close-quarters discomforts of double-celled living are not, in themselves, the deprivation of a human need.  (*See* Part III.D.1, *supra*.)  Hebert complains of inadequate cleaning supplies, but he does not present evidence of an actual sanitation threat.  (*See* Part II.E, *supra*.) Hebert further complains of the noise levels in day rooms (*see id.*), but daytime solitude has not been identified as a basic human need for Eighth Amendment purposes. Although Hebert resents the additional time he must spend in his cell since June 2012, he does not argue that his out-of-cell time is constitutionally inadequate to satisfy the basic human need of exercise.  Although Hebert (and, apparently, most every other inmate and staff member at Sterling) is baffled by the seemingly random decisions regarding inmate programming needs and requests (*see* Part II.I, *supra*), he does not link this to any particular human need.

Taking all these in combination and in the light most favorable to Hebert, he alleges a cramped, frustrating, and even disheartening environment.  But the Eighth

Amendment does not give the Court power to reach as deeply into the management of prison affairs as would likely be required to improve these conditions.  "In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility."  *Rhodes*, 452 U.S. at 351 (internal quotation marks omitted).  In this circumstance, the constitutional requirement is the need to show that various conditions combine to deprive Hebert of a basic human need.  Without considering the evidence of murders in Living Units 1–4, Hebert has not met that standard.

The question, then, is whether the evidence of murders changes anything.  The alleged threat to Hebert's life is certainly a threat to the basic human need of personal safety.  But establishing an Eighth Amendment violation requires Hebert to show that the prison conditions of which he complains "have a mutually enforcing effect that *produces*" the threat to safety.  *Wilson*, 501 U.S. at 304 (emphasis added).[13]  Thus, Hebert must have evidence that the conditions in Living Units 1–4 *cause* the inmates to murder each other.

When stated that bluntly, Hebert's theory perhaps sounds a little silly.  The Court does not view it as such.  Inmates must be responsible for their own actions, but prison

---

[13] To the extent Hebert means to argue that double-celling is inherently dangerous, his claim must fail.  The Southern District of New York has aptly explained that, "[a]s a matter of logic, it certainly must be true that inmates placed in a double cell are subjected to a higher risk of assault than inmates placed in a single cell.  That is because, all else being equal, an inmate in a double cell has at least some risk of being assaulted by his cellmate, while an inmate in a single cell is subjected to no such risk."  *Jones v. Goord*, 435 F. Supp. 2d 221, 240 (S.D.N.Y. 2006).  But "this unavoidable increase in risk cannot in and of itself violate the Constitution; otherwise double-celling would be unconstitutional *per se*."  *Id.* at 241.  Under *Rhodes*, double-celling is not unconstitutional *per se*.

officials cannot be ignorant of the characteristics of the inmates over whom they have responsibility, particularly inmates assigned to higher security classifications.  Most of the inmates so classified have been convicted of violent crimes.  *Some* amount of physical assault will inevitably occur in a population of such inmates.  *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint . . . .").  To the extent prison officials are deliberately indifferent to a substantial risk that they are stoking those ever-present embers, they violate the Eighth Amendment.

This, however, is where Hebert's claim ultimately fails.  As Defendants correctly point out, Hebert's evidence is insufficient for a reasonable trier of fact to conclude that there is a causal connection between the frustrating conditions of confinement and the murders.  (*See* ECF No. 107 at 11, 19.)  Importantly, Hebert claims that the June 2012 changes to the controlled movement schedule, which halved the inmates' out-of-cell time in Living Units 1–4 , have provoked these inmates more than anything else.  (ECF No. 106 at 23.)  Viewed in the light most favorable to Hebert, his evidence shows seven murders in the two-and-a-half years before June 2012, and two murders in the three-and-a-half years since.  (*See* Parts II.C & II.F, *supra*.)

The Court categorically rejects any notion that there exists a *per se* constitutionally permissible level of inmate-on-inmate homicide.  The testimony of Raemisch and Falk would be enough, rather, for a trier of fact to conclude that homicide

in prison is almost entirely preventable.[14]  (*See* Part II.H, *supra*.)  The problem for Hebert is that precisely at the moment that Sterling officials are alleged to have pushed Living Units 1–4 to the breaking point, *the murders decreased*.  As for cellmate-on-cellmate murder specifically (Hebert's primary concern), there has been only one, compared to six previously—even though inmates now spend *more* time with their cellmates.

Hebert has also submitted evidence of inmate-on-inmate assault in Living Units 1–4: about 1.9 recorded assaults per month from January 2010 through May 2012, and about 2.2 assaults from June 2012 through June 2014.  (*See* Parts II.C & II.F, *supra*.)  Obviously the rate of assault went up after June 2012.  But again, absent draconian isolation, some amount of inmate-on-inmate assault is unavoidable in a population of violent offenders.  In contrast to Hebert's evidence from Raemisch and Falk that the murder rate at Sterling is higher than anywhere those two long-time prison officials have ever seen, Hebert offers no comparative evidence regarding the number of assaults, nor any opinion whether the increase noted above is statistically significant.

Hebert offers evidence that Sterling's assault statistics underreport the actual number of assaults because inmates are reluctant to complain for fear of retaliation.  (*See* Part II.B, *supra*.)  The Court does not doubt Hebert's premise, but Hebert offers no

---

[14] Notably, Defendants have not attempted to argue that some particular amount of inmate-on-inmate homicide is inevitable among populations of violent offenders.  *Cf. Hudson*, 468 U.S. at 526 (reviewing national inmate-on-inmate murder statistics for a certain time period).  The Court nonetheless recognizes that prison officials walk a difficult line: a singular focus on preventing violence could lead to inhumane amounts of inmate isolation, whereas not enough focus could lead to lawsuits like this one.  *See, e.g.*, *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.) (noting prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions").

basis from which to infer some likely number of unreported assaults.  Even if he had offered such a basis, the Court could not assess its significance without appropriate comparative data.

Considering all of this, it is clear why Hebert's case is unlike *Tillery*, *Nami*, or *Baker*, all of which held double-celling to be unconstitutional under specific circumstances.  (*See* Part III.D.2, *supra*.)  To be sure, Hebert complains about the same *type* of problems noted in those cases, especially *Tillery*, such as inadequate staffing, inadequate cleaning supplies, and a suboptimal inmate classification system.  (*See* ECF No. 106 at 26–27.)  But Hebert's evidence does not show the same *extent* of problems, and in particular, that these problems "have a mutually enforcing effect that produces" a substantial risk that he will be deprived of his life.  *Wilson*, 501 U.S. at 304; *see also id.* at 305 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.").  Because Hebert does not possess such evidence, no reasonable trier of fact could conclude that he faces a substantial risk of serious harm on account of the conditions of which he complains.  *Cf. Jones*, 435 F. Supp. 2d at 244 ("there is no evidence from which a factfinder could infer the actual difference between the risk of violence in single cells and double cells, or whether that difference violates the Eighth Amendment").  Thus, Hebert fails the objective component of the Eighth Amendment test and summary judgment is appropriate on that basis.

## E.     Deliberate Indifference

Although Hebert's failure to satisfy the objective component is enough to require

summary judgment in Defendants' favor, the Court will, for thoroughness, address deliberate indifference (the subjective component) as well.

Hebert seeks prospective relief against prison officials (Raemisch, Chapdelaine, and Nycz) "to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer*, 511 U.S. at 845.  In such a suit, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter." *Id.* (citation and internal quotation marks omitted).  In particular, "to survive summary judgment, [Hebert] must come forward with evidence from which it can be inferred that the defendant-officials . . . are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Id.* at 846.

As already noted, Hebert's evidence does not show that he faces a substantial risk of harm from the conditions of which he complains.  Nonetheless, a trier of fact could reasonably infer from Hebert's evidence that *something* is or has been wrong at Sterling.  Particularly striking is Raemisch's and Falk's testimony that the number of murders at Sterling is higher than in any other facility, or even entire prison system, of which they are aware.

Even so, there is no evidence that Raemisch is ignoring Sterling's problems.  It is undisputed that he commissioned the ASCA audit and has since begun implementing reforms based on the audit committee's findings.  (*See* Part II.I, *supra*.)  Hebert complains that Raemisch has not addressed double-celling or shortened out-of-cell time, but again, there is no evidence that double-celling has been the cause of inmates'

homicidal agitation, and inmate murder has actually decreased since the reduction in out-of-cell time.  As the record currently stands, Raemisch's response has been reasonable.  *See Farmer*, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk").

Concerning Chapdelaine, Hebert has submitted no evidence regarding him at all, much less regarding his current attitudes or intentions.  This is not for lack of opportunity.  Falk, Sterling's former warden, departed in March 2015.  (ECF No. 106 at 14, ¶ 35.)  At least by that time, Hebert should have been on notice that the deliberate indifference standard would focus on the new warden.  *See Farmer*, 511 U.S. at 845–46.  Hebert allowed discovery to close on May 22, 2015.  (*See* ECF No. 75.)  He nonetheless continued to pursue (and obtained) a post-cutoff deposition of Raemisch, which Defendants had attempted to prevent with a motion for a protective order.  (*See* ECF Nos. 83, 87, 89, 96, 99, 101.)  He made no similar efforts as to Sterling's new warden, Chapdelaine.  Accordingly, Chapdelaine is entitled to summary judgment on the question of deliberate indifference.

Finally, as to Nycz, Hebert offers no evidence that she possesses any authority to change prison policy or procedures (*e.g.*, that she can implement structural changes without Chapdelaine's consent).  Thus, her current intentions and attitudes are irrelevant.

For all these reasons, the Court finds that Hebert would be unable at trial to establish Defendants' deliberate indifference.  Summary judgment for Defendants is therefore appropriate.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendants' Motion for Summary Judgment (ECF No. 97) is GRANTED;

2.    Plaintiff's claims against all Defendants are DISMISSED WITH PREJUDICE;

3.    Plaintiff's claims against Defendants Felzien and Keisel are DISMISSED for the
additional reason that Plaintiff has confessed Defendants' Motion for Summary
Judgment as to these Defendants;

4.    The Final Trial Preparation Conference set for April 5, 2016, and the 4-day
bench trial set to begin on April 18, 2016, are VACATED; and

5.    The Clerk shall enter final judgment in accordance with this Order and shall
terminate this case.  The parties shall each bear their own attorneys' fees and
costs.


Dated this 22nd day of December, 2015.

BY THE COURT:

_____
William J. Martinez
United States District Judge